2009 UT App 335

Conley J. THOMPSON; Norma J. Thompson, Trustee of the Norma J. Thompson Trust; Norma J. Thompson, individually; and Shanna J. Thompson, Plaintiff and Appellee,

v.

LOGAN CITY, a Utah municipal corporation; Logan City Board of Adjustment; Members of the Logan City Board of Adjustment in their official capacity; and John Does 1–10, Defendants and Appellants.

No. 20080876–CA.

Court of Appeals of Utah.

Nov. 19, 2009.

Rehearing Denied March 9, 2010.

Kymber D. Housley and Lee Edwards, Logan, for Appellants.

Conley J. Thompson, Logan, Appellee Pro Se.

Before Judges GREENWOOD, BENCH, and THORNE.

## OPINION

BENCH, Judge:

¶ 1 Logan City (the City), Logan City Board of Adjustment (the Board), and members of the Board appeal the district court's grant of summary judgment in favor of Conley J. Thompson and its determination that the Board's land use decision, which granted an application to establish a legal nonconforming use, was illegal. The City claims that the district court erred in concluding that the Board's decision was unlawful and in reasoning that the Board should have expressly found that the City had previously issued a building permit for a multi-family dwelling. Because the relevant statutes and ordinances do not require the Board to base its finding regarding the prior legality of a nonconforming use solely on the issuance of a building permit, we reverse the summary judgment and remand for proceedings consistent with this opinion.

## BACKGROUND

¶ 2 In 1960, Norman and Nona Watson built a home in a zone that permitted single-family, two-family, three-family, and four-family dwellings. The home's lot was large enough to accommodate a two-family dwelling. In 1970, the City changed the zone where the home was located to single-family residential. Eight years later, Ray and Carol Lucherini purchased the Watsons' home.

¶ 3 In 2006, Mr. Lucherini contacted the City to report a problem with the home's sump pump. While investigating the reported problem, the City became aware that the Lucherinis' home had a basement apartment that was being rented to another family. The City sent a Compliance Request Letter to the Lucherinis, demanding that they either come into compliance with existing restrictions for a single-family residential zone or that they submit an application to establish the property as a legally existing nonconformity.

¶ 4 Within a month, the Lucherinis filed the requisite application to determine the legal nonconforming status of their property. Along with their application, the Lucherinis submitted drawings of the residence, certain tax returns, a farm survey of their subdivision, and a handwritten note by Mr. Lucherini regarding the continuous use of the basement apartment. The City also sent notices to surrounding property owners regarding the Lucherinis' application as well as surveys to assess, among other things, the neighbors' knowledge of the use of the basement apartment.

¶ 5 After reviewing the submitted materials, the director of the City's Department of Community Development issued a letter denying the Lucherinis' application. The letter indicated that the information the Lucherinis submitted did not show that the use of the property was legally established or that the property was continuously occupied as a two-family dwelling. The Lucherinis then appealed the director's decision to the Board.

¶ 6 In response to the Lucherinis' appeal, the Board conducted a hearing wherein the Lucherinis and others presented additional evidence regarding the legality and continuous occupancy of the Lucherinis' two-family dwelling. The Lucherinis called a construction expert who had inspected the home and basement apartment to determine how the home was originally constructed. The construction expert stated that the home had two electric meters, two power lines, two gas meters, and two furnaces. The electric meters had consecutive serial numbers, indicating that they had been installed at the same time. The construction expert noted that the style of the basement apartment's kitchen panel box indicated that it was from the 1960s and that a separate doorbell, which rings to the basement, appeared to have been built with the home. The construction expert also testified that the duct work of the separate furnaces seemed to have been part of the original construction, rather than a later modification or addition.

¶ 7 The son of the original owners, Ken Watson, also testified at the hearing regarding the home's original use. According to Mr. Watson, his parents built the house when he was about five years old and the home's original construction included a basement apartment. Mr. Watson explained that his family initially lived in the basement while they were completing the construction of the upper level. As soon as the upper level was completed, his family moved from the apartment to the upper-level home and rented the apartment to tenants.

¶ 8 Mr. Lucherini testified that the basement apartment, separate doorbells, two furnaces, two electric meters, and two gas meters existed when he purchased the home. Mr. Lucherini also explained that he had installed a different entrance for the apartment in 1984 to make it easier to keep the backyard private and safe for the children who were part of his wife's daycare. In response to questions about the single electric bill for both the upper-level home and the basement apartment, Mr. Lucherini testified that he receives one bill with two readings and that utilities are included with the rent for the basement apartment.

¶ 9 The Lucherinis were not able to present the original building permit that had been issued to the home's original owners. The City's records did not include any building permits issued prior to 1963, and the only available document regarding permits issued before that date was a brief summary. This summary included only the names of persons receiving permits for a new home, the homes' addresses, and the value of the homes. The summary indicates that Mrs. Nona W. Watson, the original owner of the Lucherinis' home, received a permit for a new home. One of the other homes listed in the summary includes a note next to the home's address that states, "2 apts." Other than that, the summary does not specify what kind of permit—e.g., single-family or multifamily—was issued to any of the listed homeowners.[1]

¶ 10 As to the issue of continuous use, Mr. Watson stated that there were tenants continuously in the apartment since the time that the home's upper level was completed in the early 1960s. Mr. Lucherini testified that the apartment had been continuously occupied since he owned the home, with no more than a thirty-day break between tenants. He conceded, however, that he had never prepared a lease agreement or receipts for his tenants. Two neighbors who had lived in the area since the 1960s stated that the home's basement apartment had been continuously occupied.

¶ 11 Other evidence presented at the Board hearing suggested that the home did not legally exist as a two-family dwelling prior to the zoning change and that it had not been continuously occupied. It was reported that single-family dwellings that require a larger amount of electricity sometimes have two electric meters. There were also questions raised as to whether the entrance to the apartment prior to 1984 was truly a separate entrance for an apartment, given that entrance to the basement was through the home's backdoor. The record evidence also showed that the county had assessed the Lucherinis' home as a single-family home for tax purposes for many years. Additionally, the Polk directory, which represents a periodic inventory of homes, listed the Lucherinis' home for many years without any mention of a basement apartment or with only a notation that the basement was vacant. One set of neighbors—Plaintiffs Norma, Conley, and Shanna Thompson—returned a survey that stated the property had not always been used as a duplex.

¶ 12 After receiving all of this evidence, the Board reversed the decision of the director and granted the Lucherinis' application establishing the legality of their nonconforming use. Prior to making its official findings, the Board discussed the merits of the Lucherinis' case. One board member commented that the original homeowners' intent to have a basement apartment should have been evi-

---

1. A document in the record, seemingly prepared for the staff at the Department of Community Development, refers to an engineering report that mentions the original building permit for the Lucherinis' home. The engineering report itself, however, is not included in the record, and its actual contents remain unclear.

dent to an inspector and remarked that the City would have inspected the home before it was occupied and would have been able to halt the construction if there was a problem. That board member also noted that the City had had every opportunity to observe what was going on with the home's construction because the original homeowners had obtained a building permit. Other board members observed that the building inspector who issued the permit for the Lucherinis' home was not around at the time of the hearing to give any further information. Another board member concluded that it was obvious that the original homeowners had passed inspection. After this discussion, the Board made two findings: (1) "The two unit use was legally established based on the intent of the original construction[;]" and (2) "The two unit use has been continuously occupied since the time of construction."

¶ 13 Dissatisfied with the approval of the Lucherinis' application, Plaintiffs filed a complaint in district court, requesting review of the Board's decision. In the complaint, Plaintiffs asserted that the Board's decision was not legal, constitutional, or supported by substantial evidence. Plaintiffs and the City filed cross-motions for summary judgment. At the request of the district court, the parties filed supplemental briefing on the specific issue of whether the Board was required to find that a multi-family building permit had been issued in order to find that the nonconforming use of the Lucherinis' home was legal.

¶ 14 The district court granted summary judgment in favor of Plaintiffs, concluding that the Board's finding was insufficient as a matter of law to establish the prior legality of a nonconforming use. In doing so, the district court interpreted a section of the Utah Code regarding building permits, *see* Utah Code Ann. § 10–9a–802(2)(b) (2007), as requiring the Board to base its finding of legality exclusively on the issuance of a building permit. The district court stated that "had the Board ... expressly found that a multi-family use building permit had been issued, this [c]ourt would not disturb [the Board's] finding." But because the Board found only that the use had been established "based on

the intent of the original construction," the district court determined that the Board's decision to grant the Lucherinis' application was illegal. This appeal followed.

## ISSUE AND STANDARD OF REVIEW

■■■ ¶ 15 The City claims that the district court erred in granting summary judgment in favor of Plaintiffs and in concluding that the Board's finding was illegal because it was not expressly based on the issuance of a building permit.

> Summary judgment is appropriate only when there are no genuine issues of fact and the moving party is entitled to judgment as a matter of law. In reviewing a grant of summary judgment, we do not defer to the legal conclusions of the district court[ ] but review them for correctness.

*Springville Citizens for a Better Cmty. v. City of Springville,* 1999 UT 25, ¶ 22, 979 P.2d 332 (citation omitted); *see also* Utah R. Civ. P. 56(c). In fact, " '[w]e review the administrative decision just as if the appeal had come directly from the agency' and accord no particular deference to the [district] court's decision." *Rogers v. West Valley City,* 2006 UT App 302, ¶ 12, 142 P.3d 554 (quoting *Wells v. Board of Adjustment of Salt Lake City Corp.,* 936 P.2d 1102, 1104 (Utah Ct.App.1997)). Thus, we "determine only whether or not the decision ... is arbitrary, capricious, or illegal." Utah Code Ann. § 10–9a–801(3)(a)(ii) (2007); *see also Patterson v. Utah County Bd. of Adjustment,* 893 P.2d 602, 604 (Utah Ct.App.1995) ("The Board will be found to have exercised its discretion within the proper boundaries unless its decision is arbitrary, capricious, or illegal."). "A determination of illegality requires a determination that the decision ... violates a law, statute, or ordinance in effect at the time the decision was made...." Utah Code Ann. § 10–9a–801(3)(d). This determination "depends on a proper interpretation and application of the law[, which] are matters for our determination, and we accord no deference to ... the Board." *Vial v. Provo City,* 2009 UT App 122, ¶ 9,. 210 P.3d 947 (omission in original) (internal quotation marks omitted).

ANALYSIS

¶ 16 The City contends that the Board's finding that "[t]he two unit use was legally established based on the intent of the original construction" does not violate any statute or ordinance, or in the alternative, that it substantially complies with any statutory requirement that the Board's finding be based on the issuance of a building permit. " 'We read the plain language of [a] statute as a whole[ ] and interpret its provisions in harmony with other statutes in the same chapter and related chapters.' " *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 (second alteration in original) (quoting *Miller v. Weaver*, 2003 UT 12, ¶ 17, 66 P.3d 592). " 'In interpreting the meaning of ... [o]rdinance[s], we are guided by the standard rules of statutory construction.' " *Rogers*, 2006 UT App 302, ¶ 15, 142 P.3d 554 (omission and alterations in original) (quoting *Brown v. Sandy City Bd. of Adjustment*, 957 P.2d 207, 210 (Utah Ct.App.1998)).

¶ 17 In considering an appeal of a prior land use decision, the Board "shall render its decision at the meeting by majority vote." Logan City, Utah, Land Dev. Code § 17.57.090 (2004). "If the Board overturns or modifies the action of the [prior] decisionmakers, the Board shall make findings substantiated in conformance with the requirements of procedures for the type of action being appealed." *Id.* § 17.57.100. When determining whether a nonconforming use should be granted legal status, the Board must make findings with respect to two factors: (1) whether the use "legally existed" before a subsequent change in land use ordinances made it nonconforming with the regulations governing the use; and (2) whether the use "has been maintained continuously since the time the land use ordinance governing the land changed." Utah Code Ann. § 10–9a–103(31)(a)–(c) (Supp.2009); *see also* Logan City, Utah, Land Dev. Code § 17.62.1230 (2004) (defining a legally existing nonconforming use as "[a]n activity located on any land, or within a building or structure[,] that was lawful and conforming to regulations prior to the adoption, revision, or amendment of this Title, and by reason of the adoption[,] revision, or amendment does not comply with the use regulations of the zoning district in which it is located").

¶ 18 In concluding that the Board's finding regarding the nonconforming use was insufficient as a matter of law, the district court determined that the Board's decision ran afoul of section 10–9a–802(2)(b) of the Utah Code. Section 10–9a–802(2)(b) states, "It is unlawful to ... construct ... or change the use of any building ... without approval of a building permit." Utah Code Ann. § 10–9a–802(2)(b). The district court interpreted this section as imposing upon the Board a requirement to expressly find that a multi-family building permit had been issued. We disagree.

¶ 19 Section 10–9a–802 is part of the Municipal Land Use, Development, and Management Act, and it pertains to district court review of land use decisions, the enforcement of land use ordinances, and remedies for land use ordinance violations. *See id.* §§ 10–9a–801 to –803 (2007). It is entirely separate from the sections governing municipal appeal authorities, such as the Board. *See id.* §§ 10–9a–701 to –708 (2007 & Supp. 2009). Section 10–9a–802 states that municipalities may use actions such as injunctions, mandamus, and abatement to remedy violations of land use ordinances, *see id.* § 10–9a–802(1)(a), and that municipalities may also withhold building permits where the proposed structure or use does not fully conform to all regulations, *see id.* § 10–9a–802(2). This section makes no mention of appeal boards or evidence upon which such boards must base their findings that a particular use was lawful prior to the revision of land use regulations. Thus, the plain language of section 10–9a–802 indicates that it was intended to merely outline mechanisms for enforcing land use ordinances and remedying violations.[2]

¶ 20 The district court erred in its interpretation of section 10–9a–802, and it there-

---

**2.** In interpreting section 17–27a–802 of the County Land Use, Development, and Management Act, which is identical to section 10–9a–802, the Utah Supreme Court stated that the section "is not applicable to a challenge to a final [land use] decision but is instead a mechanism by which a county or landowner may enforce county ordinances and remedy any violations of those ordinances." *Cedar Mt. Envtl., Inc. v. Tooele County*, 2009 UT 48, ¶ 10 n. 1, 214 P.3d

fore erred in concluding that the Board's findings were in violation of the law. While the issuance of a building permit may well be clear evidence of a nonconforming use's prior legality, neither section 10–9a–802 nor any portion of the City's ordinances restricts the type of evidence that the Board may consider to make a finding that a nonconforming use was lawful prior to a change in land use regulations. In light of the discretion left to the Board—and especially in light of the City's failure to preserve adequate records of building permits issued prior to 1963 [3]—it was not unlawful for the Board to base its findings on other evidence suggesting that a multi-family building permit had been issued.

¶ 21 In so holding, we acknowledge Mr. Thompson's [4] argument that, according to *Rogers v. West Valley City*, 2006 UT App 302, 142 P.3d 554, intent is not a permissible factor upon which a finding of legal nonconformity may be based. *See id.* ¶¶ 20–21. We find *Rogers* distinguishable. In *Rogers*, this court was interpreting a West Valley City ordinance regarding only the second prong of a nonconformity test—continuous use. *See id.* ¶ 16. We there concluded that "[u]nder that [ordinance], a landowner's intent is irrelevant in determining whether a nonconforming use has been abandoned." *Id.* ¶ 21. Thus, *Rogers* does not prevent a municipality from considering intent of a landowner when determining the first prong of the nonconformity test—prior legality of the use. We further note that the record in the present case makes clear that the Board's phrase "intent of the original construction" did not

refer to the original homeowners' wants and desires alone. Rather, the shorthand reference to "intent of the original construction" refers to the Board's discussion regarding the home being originally built as a two-family dwelling and it passing inspection as originally built. Because we conclude that the relevant statutes and ordinances did not require the Board to base its findings expressly on the prior issuance of a building permit, we do not reach the City's arguments regarding substantial compliance.

## CONCLUSION

¶ 22 We conclude that the district court erroneously interpreted Utah Code section 10–9a–802(2)(b) as imposing upon the Board a requirement to expressly find that a building permit had been issued in order to conclude that a particular use had been legally established prior to a zoning change. Since no applicable ordinance or statute imposes such a requirement, it was within the Board's discretion to consider other evidence pertaining to a use's prior legality. As a result, the district court erred by granting summary judgment to Plaintiffs.[5]

¶ 23 Accordingly, we reverse and remand for proceedings consistent with this opinion.

¶ 24 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and WILLIAM A. THORNE JR., Judge.

---

95. Thus, the section should not be interpreted "to be an additional requirement" with respect to "final decisions of land use decision making bodies." *Id.*

3. Indeed, this court has recently stated that "to the extent there is ambiguity in the [municipality's own land use records], it is well established that any ambiguity will be construed against the [municipality]." *Vial v. Provo City*, 2009 UT App 122, ¶ 18, 210 P.3d 947.

4. Of the three plaintiffs, only Mr. Thompson responded on appeal.

5. Mr. Thompson asserts that he is entitled to an award of attorney fees for pursuing an issue of societal importance. We decline his request without addressing the basis for the claim because Plaintiffs have not prevailed. *See Doctors'*

*Co. v. Drezga*, 2009 UT 60, ¶ 32, 639 Utah Adv. Rep. 3, 218 P.3d 598 ("As a general rule, Utah courts award attorney fees only to a prevailing party, and only when such action is permitted by either statute or contract .... [, or when the action falls into one of] several categories of cases that may qualify for equitable awards of attorney fees .... [, such as] suits under the 'private attorney general' doctrine...."). We also note that attorney fees under the equitable private attorney general doctrine are no longer available to plaintiffs, depending on the date their action was filed. *See* Utah Code Ann. § 78B–5–825.5 (Supp.2009) ("A court may not award attorney fees under the private attorney general doctrine in any action filed after May 12, 2009.").